**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NICOLE A. CARDOSO,** | ) | |
| **Plaintiff,** | ) | **Case No. 13 C 2696** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **CELLCO PARTNERSHIP d/b/a** | ) | |
| **VERIZON WIRELESS,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nicole Cardoso worked as an Assistant Manager at a Verizon Wireless store in Crystal Lake, Illinois, until her employment was terminated following an altercation at the store. At her deposition, Cardoso testified that she – among other things – threw a phone receiver at a subordinate, pushed him so that he fell over and then kicked him while he was lying on the ground, and threw a stapler at his groin in the presence of a customer. According to Verizon, it fired Cardoso based on her conduct and because she was untruthful during its investigation of the incident. Cardoso, on the other hand, contends that her termination was due to gender discrimination and retaliation for complaining about that discrimination. Verizon's motion for summary judgment pursuant to Fed. R. Civ. P. 56 is before the court. For the following reasons, the motion is granted.

### I. BACKGROUND

#### A.    Local Rule 56.1

Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)). Under Local Rule 56.1(b)(3), the

nonmoving party then must submit a "concise response" to each statement of fact, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs," with citations to the record, that require the denial of summary judgment. *See* L.R. 56.1(b)(3)(C); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

**1. Cardoso's Responses to Verizon's Facts**

Cardoso states that she denies certain facts in Verizon's Local Rule 56.1 statement. However, many of her so-called denials do not reflect any disagreement with Verizon's facts. For example, in ¶ 28 of its 56.1 statement, Verizon states that "[Ilka] Nunez [a Human Resources employee at Verizon] reviewed portions of the surveillance video from the Crystal Lake, Illinois retail store for the afternoon of July 4, 2012." In response, Cardoso states, "ADMITTED that Núñez viewed a portion of the surveillance video, but DENIED that Núñez reviewed the entire video." Dkt. 39, Pl.'s Resp. to Def.'s Facts, ¶ 28. Cardoso then adds that "[Nunez] did not see all of it and certainly not the parts which support plaintiff's contention that what the video shows is aggression on the part of [Retail Sales Representative Marcus] Paredero, and not friendly 'horseplay' as characterized by plaintiff."[1] *Id*. Merely saying that a fact is disputed does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment. *See Hurst v. Mauger*, No. 11 C 8400, 2013 WL 1686842, at *2 (N.D. Ill. Apr. 16, 2013). The court will, therefore, disregard so-called denials of facts that are actually undisputed.

---

[1] The court assumes that Cardoso meant to say "not friendly 'horseplay' as characterized by *Verizon*" since Nunez appears to be the person who characterized the interaction between Paredero and Cardoso as "horseplay" and Cardoso has consistently objected to this term.

In addition, Cardoso appears to have characterized certain agreed facts as disputed to provide an opportunity to include legal arguments about the facts. She also includes legal arguments in her responses to Verizon's facts. For example, in ¶ 54 of Verizon's statement, Verizon states that Amr Wahba (the District Manager for the area including the Crystal Lake Verizon store) and David Heath (the Manager of Retail Sales at that store) were not involved in the decision to terminate Cardoso's employment. In response, Cardoso states:

> ADMITTED that neither Wahba nor Heath contend that they played no role in the decision to terminate Cardoso, but DENIED that such contested fact question, as a matter of law, is sufficient to rebut an inference that they either knew about Cardoso's protected activity involving Wahba, which can be inferred that they did, or that they could have participated in, or instigated the decision to terminate plaintiff for discriminatory or retaliatory motives, or both. *See, Sandra Scott v. Sunrise HealthCare Corp.*, 195 F.3rd 938, 941 (7th Cir. 1995), as Heath made the first complaint to HR about July 14, 2012, both he and Wahba were interviewed by Núñez before July 25, 2012 (when Cardoso was interviewed), Wahba prepared a MSOF [Manager Statement of Facts form], Def. Ex. 13; Wahba had a strange attitude towards Cardoso shortly after the interview of July 25, 2012 wherein she complained about Wahba's perceived gender discrimination; and, both Wahba and Heath were invited to attend the telephonic discharge on August 14, 2012. See CSMF ¶¶21, 22, 29, 30, 34 and defendant's statement of facts, ¶56.

Legal arguments in Rule 56.1 submissions are improper. *See, e.g., Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008). The court will disregard all of the legal arguments in Cardoso's Rule 56.1 submissions. Similarly, to the extent that Cardoso's denials are unresponsive, evasive, or argumentative, Verizon's corresponding facts are deemed admitted. *See Flores v. Giuliano*, No. 12 C 162, 2014 WL 3360504, at *2 (N.D. Ill. July 9, 2014); *Bennett v. Unitek Global Serv., LLC*, No. 10 C 4968, 2013 WL 4804841, at *3 (N.D. Ill. Sept. 9, 2013).

Moreover, proper responses to the movant's proposed facts point to evidence refuting the movant's facts. It is improper to add additional unrelated facts. *See Ciomber v. Cooperative*

*Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (district court properly did not consider portions of the plaintiff's response to the defendant's facts as it "contained several extremely long, argumentative paragraphs, and in those paragraphs [the plaintiff] simultaneously denied the veracity of [the defendant's] proposed material facts and presented additional facts of his own"). The court has considered factual assertions in Cardoso's statement of additional facts, to the extent that they are supported by the record. The court will not, however, consider non-responsive facts in Cardoso's response to Verizon's Rule 56.1 submission.

### 2.    Cardoso's Additional Facts

The court next considers Cardozo's statement of additional facts. The thirty-seven paragraphs are lengthy. Without the caption or signature block, Cardoso's additional facts are approximately twenty-four pages long, resulting in an average paragraph length of 2/3 of a double-spaced page. The paragraphs frequently contain completely unrelated facts as well as legal arguments. Moreover, many of Cardoso's proposed facts are supported by inaccurate citations to the record or general references to the record with no pinpoint citations. Cardoso also cites to both the videotaped deposition of Angela Daniels and the transcript of that deposition. *See, e.g.*, Dkt. 40, Pl.'s Add'l Facts, at ¶ 16. In addition, she cites to documents that are not included in her exhibits, such as Verizon bates no. 883.

Local Rule 56.1 directs counsel to present facts in "short numbered paragraphs" to prevent lengthy stream-of-consciousness submissions that are difficult for opposing counsel and the court to assess. As noted above, legal arguments have no place in a statement of facts. And "[t]he requirement of specific citations helps the parties and the court focus on asserted disputed issues of fact, a required task in considering motions for summary judgment, but a task made

impossible when facts are blurred together as they are here. " *Trela v. United Parcel Service, Inc.*, No. 08C6195, 2010 WL 569954, at *1 (N.D. Ill. Feb. 10, 2010) (striking portions of a statement of facts filed by Mr. Rossiello – who is also counsel for the plaintiff in this case – based on his failure to comply with Local Rule 56.1 and this court's standing order) (Gottschall, J.).

The court will also disregard citations to the videotaped version of O'Daniels' deposition as without the benefit of a pinpoint cite to the transcript, it cannot determine what portion of the deposition is at issue. Next, the court will disregard facts that are purportedly supported by citations to documents that Cardoso did not submit. *See Pulliam v. City of Chicago*, No. 08 C 7318, 2010 WL 3238837, at *5 (N.D. Ill. Aug. 12, 2010). The court also notes that it is not obligated "to scour the record in search of material factual disputes" or to correct inaccurate or missing pinpoint citations. *See Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 664 n.2 (7th Cir. 2005). To the extent that Cardoso's additional facts are insufficiently supported by the record, they will not be considered.[2] Finally, as with Cardoso's responses to

_____

[2] While not required to do so, Verizon's counsel spent what must have been a significant amount of time attempting to locate the correct record citations for many of Cardoso's additional facts. The court appreciates this effort. To the extent that facts are relevant and the court was able to identify supporting evidence based on Cardoso's citations or Verizon's corrected citations, the court has considered those facts. Where Cardoso's citations are inaccurate and Verizon did not voluntarily provide a correct citation, however, the court has not scoured the record in an effort to find support for Cardoso's assertions of fact. The court also does not approve of counsel's practice of using "*id.*" for the first citation in a compound paragraph of additional facts. In these instances, the court limited its review of the record to the specified pages of the prior cited document (which overwhelmingly have no discernable relationship to Cardoso's factual assertions associated with the "*id.*" citations). The court's desire to reach the merits of Cardoso's claims is the only reason it did not, in an exercise of its discretion, strike her additional facts in their entirety. *See Ezell v. Bass*, No. 09 C 6908, 2012 WL 379744, at *2 (N.D. Ill. Feb. 1, 2012) (striking a party's entire Local Rule 56.1 statement because "many" of its citations were inaccurate, thereby "cast[ing] substantial doubt upon the veracity of all of [the

Verizon's facts, the court will not consider argumentative facts or legal conclusions masquerading as "facts."

Despite all of these problems, in the interests of resolving Verizon's summary judgment expeditiously and on the merits, the court declines to strike the vast majority of Cardoso's additional facts based on what the court must regretfully characterize as counsel's egregious failure to comply with Local Rule 56.1. Counsel is admonished that if he fails to comply with Local Rule 56.1 in the future, the court may exercise its prerogative to enforce that rule strictly. *See Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). With these rulings in mind, the court turns to the facts.

**B.     Facts**

The following facts are undisputed unless otherwise noted.

**1.      Cardoso's Employment With Verizon and Relevant Verizon Employees**

Cardoso began working for Verizon's predecessor company in 1997 as a part-time Customer Service Representative at Verizon's facility in Elgin, Illinois. In May 2002, she became a Representative, Retail Customer Support. In 2008, she was promoted to the position of Assistant Manager of the Verizon store in Crystal Lake, Illinois. In this role, her direct supervisor was David Heath, the Manager of Retail Sales for that store. When Heath was not at the Crystal Lake retail location, Cardoso was the highest ranking manager there.

party's] citations and statements").

Cardoso's job duties as Assistant Manager included leading the team, assessing the performance of her sales associates, and ensuring customers are treated well. Cardoso was also responsible for managing the performance of subordinate employees, staffing, employee relations, implementation of merchandising plans, financial and sales reporting, customer retention, resolution of escalated customer complaints, and maintaining market and industry knowledge. During her deposition, Cardoso acknowledged that her position as Assistant Manager required her to provide an open and supportive environment for Verizon employees and to encourage employees to act ethically and professionally.

Robert St. Marie and Marcos Paredero worked under Heath and Cardoso as Retail Sales Representatives at Verizon's Crystal Lake store. As an Assistant Manager, Cardoso's commissions were based upon the overall performance of the Crystal Lake store. In contrast, the commissions of Retail Sales Representatives, such as St. Marie and Paredero, were based on their individual performance. As an Assistant Manager, Cardoso had a higher short-term bonus potential than Retail Sales Representatives. Moreover, because she was in a management position, Cardoso received management-specific training, including a "Civil Treatment for Managers" course and a Leader Training Program, that Verizon did not provide to Retail Sales Representatives.

In January 2012, Amr Wahba became Cardoso's District Manager as he was responsible for the area including the Crystal Lake Verizon store. Ilka Nunez is a "Consultant – Human Resources Business Partner" at Verizon. Nunez reported to Jennifer Dennison, the Acting Associate Director of Human Resources at Verizon, Jacqueline Underwood, the Director – Human Resources Business Partner at Verizon, and Craig Ritchie, the Executive Director –

Human Resources Business Partner at Verizon. Elizabeth Troxell is a Senior Consultant – Employee Relations/EEO at Verizon. Lisa Damask is Verizon's Vice President of Human Resources.

### 2. Verizon's Policies

Verizon employees are bound by Verizon's Code of Conduct. The Code of Conduct provides, in relevant part:

> We earn credibility with our customers, business providers and co-workers by keeping our commitments, acting with honesty and integrity and pursuing our company goals solely through ethical and professional conduct.
>
> If you are a supervisor, you have the added responsibility of creating an open and supportive environment where employees feel comfortable asking questions, raising concerns and reporting misconduct. Ethical behavior does not simply happen; it is the product of clear and direct communication of behavioral expectations, modeled from the top and demonstrated by example.

Dkt. 34-4, Code of Conduct, at 29. The Code of Conduct also states that employees "must report suspected and actual violations of this Code, company policy and the law." *Id*. at 30. In addition, it provides that Verizon "will not tolerate any threatening, hostile or abusive behavior in the workplace . . . and will take immediate and appropriate action against offenders, up to and including termination of employment and referral for criminal prosecution." *Id*. at 32

Verizon also maintained an Equal Employment Opportunity and Affirmative Action Policy which Verizon gave to all of its employees, including Cardoso. That policy provides, in relevant part:

> Supervisors/managers are responsible for ensuring compliance with this policy and for providing a work environment free from any form of discrimination or harassment . . . . Managers who have knowledge of conduct that violates company policy and fail to take the proper corrective steps, or who otherwise condone such conduct, will themselves be subject to corrective action up to and including termination of employment.

*Id*. at 16.

Cardoso understood that as a manager, if she felt that one of her employees was the victim of harassment or retaliation or if she was aware of any violations of the Code of Conduct or the EEOC policy, she had to report the conduct to Verizon. She further understood that if she failed to do so, Verizon could terminate her employment. During her deposition, Cardoso acknowledged that pushing, shoving, kicking or physically assaulting another employee would violate the workplace violence policy in Verizon's Code of Conduct. She also stated that she knew that she should report any complaints of discrimination or harassment to her supervisor or Human Resources, or call Verizon's Compliance Guideline phone number and understood that the Compliance Guideline system existed to allow employees to "call in to make complaints" about "[a]nything that [employees] feel that is not happening – that is not right." Dkt. 34-1, Cardoso Dep., at 86:16-24. In addition, she agreed that because she was a management-level employee, the Code of Conduct required her to set the tone of the Crystal Lake store.

### 3. The July 4, 2012 Incident and Verizon's Investigation Into the Incident

Heath, the Manager of Retail Sales for the Crystal Lake store, was on vacation on July 4, 2012, leaving Cardoso in charge. On July 10, 2012, Heath sent himself a reminder email entitled "Nicole Performance Issues from while I was gone." Dkt. 42, Ex. 8 at Bates No. 677.[3] The email listed issues with the store that occurred during Heath's absence, such as missing price tags and several burned out lights on the sales floor.

---

[3] In Cardoso's appendix to her statement of additional facts, she identifies "Verizon Documents/Group Exhibit" as Exhibit 8. After some hunting – which the court is not required to do – the court realized that these documents were under the "Exhibit 7" tab, along with the documents comprising Exhibit 7. To minimize confusion, the court will refer to Verizon's documents as Cardoso's Exhibit 8.

At some point after returning from his Fourth of July vacation, Heath contacted Nunez in Verizon's Human Resources department about a conversation that he had with Retail Sales Representative St. Marie. Heath reported that St. Marie had voiced concern about physical interactions between Cardoso and Retail Sales Representative Paredero on July 4th, possibly in the presence of customers. After speaking with Heath, Nunez followed up by emailing Samuel Martinez (an employee in Verizon Wireless's Corporate Security department) to request a copy of the surveillance video from the Crystal Lake store on July 4, 2012. Nunez also interviewed Paredero, Cardoso, and St. Marie.

### a. Nunez' Interview with Paredero

Nunez met with Retail Sales Representative Paredero on July 18, 2012. Paredero told Nunez that on July 4, 2012, toward the end of the day, Cardoso threw various objects at him, including a telephone receiver and a stapler. He stated that the stapler hit him in the groin and that as a result, he asked for permission to leave work early as he was in pain. Following this interview, Nunez sent a second email to Martinez asking if he could locate any surveillance video from the Crystal Lake store on July 4, 2012, showing Cardoso throwing a phone receiver or stapler at Paredero.

### b. Nunez' Interview with St. Marie

Nunez also interviewed Retail Sales Representative St. Marie. St. Marie stated that between approximately 3:00 p.m. and 5:00 p.m. on July 4, 2012, Cardoso and Paredero were engaged in physical interactions in the Crystal Lake Verizon store. St. Marie reported that he saw Paredero hit Cardoso on the head with a box. After that, Cardoso threw a stapler at Paredero.

### c.     Nunez' Interview with Cardoso

On July 25, 2012, Nunez visited the Crystal Lake store to investigate the allegations about Heath (his alleged late arrivals and early departures) and the July 4th incident.  She interviewed Cardoso and took notes.  Cardoso admitted that she threw objects at Paredero, including a stapler aimed at Paredero's groin which hit its target and caused him to fall to the floor.  Nunez's deposition testimony, which is consistent with her notes, reflects that Nunez told Cardoso that surveillance video showed Cardoso throwing a stapler and phone receiver at Paredero while a customer was shopping.  Cardoso argues inconsistently that she told Nunez that customers were not present and that she did not recall if customers were present when she threw the stapler.[4]  During this conversation, Cardoso did not tell Nunez that she had felt intimidated or threatened by Paredero, either on the date of the stapler-throwing incident or any other time.  Cardoso also did not say that she threw a stapler and other objects at Paredero in self-defense.

Nunez asked Cardoso if she was having any issues at the store.  In response, Cardoso told Nunez that she felt that Wahba "talks to females differently."  Dkt. 34-4, Nunez Decl., ¶ 12. Cardoso also told Nunez that she felt Wahba spoke to her in a "tone," was not personable and did not give her one-on-one coaching.  *Id.*; *see also* Dkt. 34-1, Cardoso Dep., at 167:2-170-2, 170:19-25 (stating that Wahba ignored her while saying hello to "other people," "talk[ed] down to people," and was "condescending.  He would talk down to me like I wasn't a person.").  Cardoso then voiced concern about possible retaliation.  Nunez told her twice that retaliation

_____

[4] During her deposition, however, Cardoso testified unequivocally that a customer was present when she felled Paredero by throwing a stapler at his groin and then while he was lying on the floor.  Dkt. 34-1, Cardoso Dep., at 150:4-7 ("Q: And a customer was present when [Paredero] was lying on the floor [after being hit by the stapler].  A:  Right.  A customer was present also when [Paredero] hit me over the head with the box.").

would not occur.  According to Nunez and Wahba, Nunez did not tell Wahba about Cardoso's complaints about him.[5]

### d.    Cardoso's Version of Events

According to Cardoso, on an unspecified date, she twice reported Heath for tardiness. She made these reports to Shawn Hansen, who was the District Manager for the region that included the Crystal Lake store at that time.  Thus, the  reports pre-date January 2012, when Wahba became the District Manager.

During her deposition, Cardoso acknowledged that on July 4, 2012, she threw a phone receiver at Paredero and pushed him using a chair.  In addition, she stated that she pushed Paredero by placing her hands on his face, causing him to fall over, and then kicked Paredero while he was lying on the ground.  Cardoso also acknowledged that she threw a stapler at Paredero's groin in the presence of a customer, causing him to fall to the ground while "grabbing himself."  Dkt. 34-1, Cardoso Dep. at 149:12-23.

Cardoso explained that she used force on Paredero after he hit her in the head with a box of batteries and poked her in the rear with a pole used to close the store's window shades.  She stated that she did not walk away after Paredero used force on her because "if somebody hits you you're going to defend yourself . . . . your instant reaction is to defend yourself . . . . was to do

---

[5]  In response to this statement of fact, Cardoso states, "DENIED that Núñez did not "share this information" with Wahba.  See CSMF ¶ [sic]."  Dkt. 39, Pl.'s Resp. to Def.'s Facts, ¶ 25.  Local Rule 56.1(b)(3) requires the party opposing summary judgment to cite to "specific references to the affidavits, parts of the record, and other supporting materials relied upon" when denying a fact.  A denial supported by a cross-reference to an unspecified portion of Cardoso's statement of additional facts is insufficient.  The court will not guess what paragraph Cardoso intended to cite.

something, was I grabbed something, and that was my instant [reaction]." *Id*. at 150:11-12, 21-25.

When Paredero poked her with a pole and threw a box at her head, it did not occur to Cardoso to call the police or a supervisor. Despite her knowledge of Verizon's Code of Conduct, Cardoso never reported Paredero's physical conduct towards her (either on July 4, 2012, or before) to her supervisor, her District Manager, Human Resources, or the Verizon compliance hotline. Despite Verizon's policy specifically instructing employees to call the police if they felt they were in imminent danger, Cardoso did not call the police. Cardoso did not send Paredero home after the first physical incident on July 4, 2012, because the store was "already short-staffed at that time." *Id*. at 145:17-22.

e.    **The Surveillance Videos**

As part of her investigation, Nunez reviewed portions of the surveillance video from the Crystal Lake, Illinois retail store for the afternoon of July 4, 2012. Nunez decided to review video from the afternoon based upon the information provided to her by Cardoso, Paredero and St. Marie. According to Cardoso, video recorded in the morning that Nunez did not watch showed Paredero engaging in inappropriate behavior with Luke Money (another Retail Sales Representative) in the presence of customers, such as following Money around the store with an air compressor can while a customer made a bill payment.

When Nunez watched the video filmed in the afternoon, she saw Cardoso and Paredero engaging in what she characterized as "horseplay." Nunez could not tell who instigated the interaction. She saw Paredero hit Cardoso on the head with a long, narrow box. Nunez also saw Cardoso punch Paredero in the jaw/face area, kick Paredero several times while he was on the

ground, and throw various objects, including a phone receiver and a stapler, at him. The tapes showed a customer in the area during the stapler-throwing incident.

### f. Prior Complaints by Cardoso About Her Co-Workers

Cardoso had complained to Heath about Paredero prior to the July 4th incident. However, she complained about "[Paredaro] not listening, him being disrespectful, him not following through with items that we were supposed to be doing. Dave [Heath] would just let it go." Dkt. 42-1, Cardoso Dep., at 147:9-19. Despite the "just let it go" comment, however, Cardoso testified that Heath sent Paredero "numerous emails" about performance issues that were placed in Paredero's file and verbally counseled Paredero about these issues. *Id*. at 147:20-148:8. Cardoso believed that Heath did not discipline Paredero enough because he wanted to let Paredero "slide" since "[t]hat's just the relationship they had." *Id*. at 148:19-25. She also generally states that she believed that Heath was responsive only when male employees reported disciplinary issues to him.

Cardoso acknowledged that she called Verizon's compliance hotline in 2006, 2007, and 2010 to complain about how she was treated when she returned from FMLA leave, a reprimand she received when she took time off to address a flooding issue at her home, and a Verizon employee (Steve Townsend) who raised his voice after she told him he could not take a full hour for his lunch break.

### 4. Verizon's Decision to Terminate Cardoso's Employment

In late July or early August 2012, Nunez contacted her direct supervisor, Jennifer Dennison (Verizon's Acting Associate Director of Human Resources), to alert her to the reports Nunez had received about the events at the Crystal Lake store on July 4, 2012. Nunez and

Dennison discussed Cardoso's actions, Verizon's expectations of its managers, and how Verizon had handled prior similar incidents.[6]  They also discussed Cardoso's obligation to report any suspected or actual violations of Verizon's Code of Conduct, company policy, the law, Verizon's expectations of its managers, the fact that Verizon holds managers to higher standards of conduct than non-management employees, and Verizon's expectation that its managers will be role models for subordinate employees.[7]

On August 9, 2012, and at Dennison's request, Nunez sent Dennison an email summarizing her interviews of Cardoso, Paredero and St. Marie, as well as her observations from the surveillance videos.  Dennison then discussed the incident with her manager, Craig Ritchie.  Ultimately, Nunez and Dennison decided to recommend that Verizon terminate Cardoso's employment.  Verizon contends that this recommendation was based on the egregious nature of Cardoso's conduct, Cardoso's lack of forthrightness during the investigation, and the fact that she was a management-level employee.  Cardoso, in contrast, alleges that Paredero instigated the physical interaction that was captured on video, that his conduct was more egregious, and that

_____

[6]  Nunez testfied that Dennison told her about a situation in Wisconsin in which a male Assistant Manager and two male Retail Sales Representatives were involved in inappropriate horseplay in the presence of customers.  In that instance, Verizon terminated the employment of the Assistant Store Manager and gave the two Retail Sales Representatives Final Written Warnings.  The court will not consider this evidence as Cardoso correctly objects that it is hearsay.

[7]  Cardoso does not contest that Verizon holds management-level employees to higher standards than non-management employees.  Nevertheless, in her response to Verizon's 56.1 statement, she asserts that "this [expectation] may also infer [sic] they [Verizon] believe that they may use the 'higher standard' of conduct as a pretext for discrimination unlawfully to retaliate against an employee for engaging in protected activity."  Dkt. 39, Pl.'s Resp. to Def.'s Facts, at ¶ 35. This "denial" is speculative, argumentative, and improper.  It will not be considered.

Verizon employees recommended terminating her and then terminated her because she had complained about gender discrimination.

After Nunez and Dennison arrived at their recommendation, Nunez directed Wahba to fill out the Manager Statement of Facts form ("MSOF"). Def.'s Ex. 13. Wahba filled in basic information about Cardoso, such as her name, title, and supervisor. In the section entitled "Code of Conduct," he briefly stated that Cardoso "threw Stapler at another Employee/Wrestled with another employee" and that Human Resources investigated. *Id.* He left the remainder of the form blank and thus did not make a recommendation about what corrective action, if any, Verizon should take. It is undisputed that managers routinely prepare the facts in the MSOF because a manager's name must appear on the form. Wahba prepared the initial draft based on input from Nunez. He had no involvement in the subsequent revisions to his draft of the MSOF.

On August 10, 2012, Dennison sent an email to Ritchie and Jacqueline Underwood (the Director – Human Resources Business Partner at Verizon) about Cardoso. Dennison forwarded the draft MSOF prepared by Wahba, as well as Nunez's summaries of her witness interviews and her review of the surveillance videos. Dennison included Underwood because she knew that Ritchie was out of the office and that Underwood was his authorized designee during his absence. Underwood forwarded Dennison's email to Elizabeth Troxell (Senior Consultant – Employee Relations/EEO at Verizon) with a copy to Dennison and Nunez and asked Troxell to provide input on the MSOF for Cardoso. In her email, Underwood commented that she supported the decision to terminate Cardoso's employment but wanted Troxell's input prior to sending the MSOF to Lisa Damask (Verizon's Vice President of Human Resources) for review.

Troxell works in the Employee Relations group within the Human Resources department at Verizon and thus is often consulted with respect to terminations. In response to Underwood's email, Troxell sent a return email stating that she was "appalled" by the behavior of both Cardoso and Paredero and that both employees needed corrective action. Def.'s Ex. 16, Troxell Dec., at ¶ 4. In her email, Troxell characterized the situation as "horseplay" but specified that Paredero hit Cardoso in the head with a box and that Cardoso – in the presence of customers – threw a phone receiver and stapler at Paredero (causing him to fall to the ground), chased Paredero with a chair, and allowed employees to play with bean bags. Troxell also suggested that Underwood modify the MSOF to state more explicitly that Cardoso was not honest or forthcoming during the investigation because Cardoso's version of events conflicted with the security video.

Dennison incorporated Troxell's suggested changes to the MSOF and sent an updated copy of the MSOF to Underwood and Ritchie for review. On August 10, 2012, Underwood forwarded the revised MSOF to Damask, with a copy to Ritchie, for review and approval. Underwood recommended the termination of Cardoso's employment as a result of her "inappropriate horseplay with a Retail Sales Representative while customers were in the store" and Cardoso's dishonesty during Verizon's investigation. Def.'s Ex. 14, Underwood Dec., at ¶ 8; Ex. 18, Damask Dec., at ¶ 3. Both Underwood and Damask believed that if Cardoso had felt threatened by Paredero, she could and should have reported her concerns to her supervisor, Verizon's compliance hotline, or the police, as specified in Verizon's Code of Conduct. They also believed that Cardoso's conduct was appalling and inexcusable given her status as an

Assistant Manager.  On August 13, 2012, Damask approved the decision to terminate Cardoso's employment.

Ritchie, Troxell, Underwood, and Damask stated that they made the decision to terminate Cardoso's employment without input from Wahba.  Prior to the filing of this lawsuit, Ritchie, Troxell, Underwood, and Damask stated that they did not know that Cardoso had complained to Nunez that Wahba spoke to Cardoso in a "tone," spoke to females differently, was not personable, and did not provide Cardoso with one-on-one coaching.[8]  Dkt. 34-12, Ritchie Dec., at ¶ 10; Dkt. 34-14, Underwood Dec., at ¶ 12; Dkt. 34-16, Troxell Dec., at ¶ 9; Dkt. 34-18, Damask Dec., at ¶ 7.  Neither Wahba nor Heath was involved in the decision to terminate Cardoso's employment.[9]

_____

[8]  Cardoso asserts that Wahba was aware of her complaint of gender discrimination prior to her termination.  In support, she points to her deposition, when she asserted that Nunez told Wahba about the complaint, explaining, "[w]ell, obviously she spoke to him about his behavior, so he started to change a tune and he started acknowledging me and talking to me at that point, but it wasn't sincere, it wasn't genuine.  You could tell he had a problem that I had reported him."  Dkt. 42-1, Cardoso Dep., at 183:8-12.  When asked what Cardoso meant by "obviously," Cardoso stated that she knew that Wahba was aware of her complaint "[j]ust based on his behavior.  He was acting different than what he had normally acted."  *Id*. at 183:16-17.  Cardoso's claim that Wahba knew about her complaint is speculative and, therefore, insufficient to create a factual issue.

[9]  In Cardoso's response to ¶ 37 of Verizon's facts, she states, "All participants (including Heath and Wahba) in the decision to discharge either had the facts incorrect, never saw the full video to determine who the aggressor and instigator was, and, except for Núñez, never directly interviewed Cardoso.  See, Pl. Ex. 1, surveillance videotape of July 4, 2012, Clips 19, 20, 22 and 25; Cardoso CSMF ¶¶ 11, 19, 25-29.)"  The cited portions of the record do not support the proposition that Heath and Wahba had input into whether Verizon should terminate Cardoso's employment.  Thus, Cardoso has not created a disputed issue of fact as to this point.

### 5.     The Termination of Cardoso's Employment

On August 14, 2012, Nunez called Cardoso at the Crystal Lake store and advised her that Verizon had decided to terminate her employment.  When Nunez called, Heath and Wahba were at the store with Cardoso.  Verizon's proffered reason for its decision was Cardoso's inappropriate conduct at the Crystal Lake store on July 4, 2012, as well as her untruthful statement during the course of the investigation that there were no customers in the store at the time of the incident.

Nunez told Cardoso that the security video showed Paredero hitting Cardoso in the head with a box.  Nunez  also stated that the video showed Cardoso punching Paredero in the face, kicking him while he was lying on the ground, chasing Paredero with a chair, and throwing various objects at Paredero, including a stapler and a telephone receiver, while customers were in the store.  In addition, Nunez told Cardoso that the video showed Paredero falling to the ground after being hit in the groin with the stapler.  Nunez concluded by stating that Cardoso, as a manager, was responsible for enforcing professional conduct in the workplace, and that the events of July 4, 2012, in the presence of customers compromised Verizon's reputation and business.  In response, Cardoso told Nunez that "[she] did not expect someone to hit [her] over the head with a box and for [her] not to react."  Dkt. 42-1, Cardoso Dep., at 182:4-6.[10]

After this conversation, Cardoso thought she had been fired in retaliation for reporting Wahba's gender bias against her.  She also believed that Verizon acted without a full

---

[10]  Verizon provided excerpts from Cardoso's deposition, while Cardoso provided the entire deposition transcript. Where the relevant portions are not in Verizon's excerpts, the court has cited to the transcript provided by Cardoso.  In any future cases, counsel is strongly encouraged to submit entire transcripts as joint exhibits.

understanding of what happened on July 4, 2012, because no one watched the entire security video. In addition, Cardoso did not believe she had been dishonest about whether customers were present during the incidents on July 4, 2012.

**6.      Verizon's Decision to Issue a Final Written Warning to Paredero**

Nunez and Dennison decided to issue a final written warning to Paredero due to his inappropriate conduct on July 4, 2012.[11] Ritchie approved this recommendation. Verizon explained that it gave Paredero a final written warning instead of terminating his employment because he was a subordinate employee who was not held to the same behavioral standards as a member of management. As Verizon explained, Cardoso "was the manager whereas Paredero was a subordinate employee. Cardoso had a responsibility to either report or stop inappropriate behavior by subordinate employees; she did neither." Dkt. 39, Pl.'s Resp. to Def. Facts, at ¶ 69. Thus, according to Nunez, "[Cardoso] had a duty to act on that day, either to report it or stop the behavior. She did not report it. And she didn't stop it. She was engaged in it." Dkt. 34-7, Nunez Dep., at 27:5-11.

Verizon treats a final written warning as a very serious disciplinary measure. A final written warning is part of an employee's permanent personnel record and prevents the affected

---

[11]   In their declarations, Dennison and Ritchie state that in the past, when faced with a situation involving inappropriate physical interaction between an Assistant Manager and Retail Sales Representatives, the Retail Sales Representatives received final written warnings. Cardoso does not dispute the contents of the declarations but contends that evidence of other discipline may be inadmissible hearsay because her counsel could not cross-examine Dennison or Ritchie as to this issue. The court will not consider the prior discipline as Verizon did not provide details about the underlying conduct. Thus, the court cannot ascertain if Cardoso and Paredero are similarly situated to the employees involved in an unspecified number of allegedly comparable events.

employee from receiving bonuses, promotions or opportunities for advancement at Verizon during the term of the warning.

       **7.**      **Wahba**

            **a.**      **Cardoso's Interactions with Wahba**

At her deposition, when asked to identify the basis of her belief that Wahba harassed her and discriminated against her due to her gender, Cardoso responded:

> Well, he discriminated against me. When I – he'd walk me to location [sic] he would not acknowledge me at all whatsoever. He'd walk up to the men, acknowledge them like – you know, he just never acknowledged me. It made me feel very left out, very not part of the team. I was there to defend myself when it came to anything. I didn't have the support from him or Dave [Heath].

Dkt. 34-1, Cardoso Dep., at 59:1-18. Additionally, Cardoso testified that Wahba harassed her because he "walk[ed] by [her], ignor[ed] [her]" and spoke to her in a "tone of voice." *Id*. at 67:4-13, 68:4-8. Cardoso also asserted that Wahba ignored her. However, Cardoso admitted that she never brought any issues to Wahba's attention or asked him for support. Cardoso contends that she did not do so because she felt that neither Wahba nor Heath would not be responsive and that she needed to remain employed.

Cardoso believed that Wahba treated her differently based upon her sex because, "He's Middle Eastern. He comes from a [sic] where – an area where they treat women however they treat them, and that's how I felt." Dkt. 34-1, Cardoso Dep., at 194:7-11. When asked to elaborate, Cardoso stated:

> Q:      Right before we broke you said something about that [Wahba] was Middle Eastern . . . . And they treat women poorly from where he's from.
>
> A:      I did not say they treat poorly. I just said the way how they treat their women is not how American people treat their women.

Q:    Okay. Where is he from?

A:    I'm assuming from Middle Eastern, I mean some kind of Arab, some kind of Indian.

Q:    Does he speak with an accent?

A:    No.

Q:    Do you know if he was born in the United States?

A:    That I do not know.

Q:    What makes you think he's from somewhere in the Middle East?

A:    Just from like his name.  His sister used to wear a turban.

Q:    How do you know that?

A:    Because she used to be a floating supervisor.

Q:    And so when you mentioned that he's a Middle – from the Middle East, you used that to say that it's for the support of your belief that he doesn't like women, or that he doesn't treat women –

A:    Right.  That's his culture, and that's how he looked as women as beneath him, that they're not equal to him, that he can treat them however he wants to treat them and they're less than.

Dkt. 34-1, Cardoso Dep., at 196:3-197:14.

According to Heath, he never saw Wahba speak to Cardoso in a condescending "tone" or treat her any differently than any other male employee.[12]

---

[12] The court has been proceeding through the facts based on the rulings in the first section of this opinion addressing the issues with Cardoso's Rule 56.1 submissions.  It pauses to provide a specific example of an illustrative problem with many of Cardoso's denials.  In response to Verizon's statement about Heath's statement that he was unaware that Wahba treated Cardoso differently than male employees, Cardoso states, "ADMITTED that Heath gave a recent and belated declaration stating he never witnessed his district  and boss acting in a discriminatorily manner; but such would not be required or necessary, as Verizon is vicariously liable, as a matter of law, for Wahba's gender-bias done within the scope of his employment; he

### b. Other Employees' Opinions About Wahba

Jared Grizzle, a manager at another Verizon store in Illinois who was supervised by Wahba from January 2012 through January 2014, described Wahba as a "tough manager" who was results-oriented, loud, and confrontational.[13] Dkt. 34-2, Grizzle Dec., at ¶¶ 5, 6, 7. Grizzle thought that Wahba was not personable and stated that Wahba yelled at him during a face-to-face meeting. In Grizzle's experience, Wahba tended to spend more time with store managers than assistant store managers or retail sales representatives regardless of the gender of employees because Wahba was responsible for the overall performance of the stores in his district and managers had the most relevant knowledge.

This is consistent with Cardoso's testimony (which Verizon correctly notes is inadmissible hearsay) that Carolyn O'Daniels, an Assistant Manager who worked in Wahba's district, told Cardoso that Wahba "talk[ed] down" to her, "goes and speaks to other people first," and ignored her in favor of talking to the store manager, who was male. Dkt. 42, Cardoso Dep., at 14:4-7, 18-25. O'Daniels testified at her deposition that she was distrustful of the legal system

---

was "aided in the agency" in Supreme Court parlance. See, *Burlington Industries, Inc. v. Ellerth*, 542 U.S. 742 (1998)." Dkt. 39, Pl.'s Resp. to Def.'s Facts, ¶ 75. This "denial" is argumentative, unresponsive, and non-factual. As such, it is insufficient to make Verizon's corresponding factual assertion disputed.

[13] At the risk of larding this opinion with footnotes, the court notes that Cardoso's "denial" regarding Grizzle's opinion about Wahba does not refer to specific opposing evidence. Dkt. 39, Pl.'s Resp. to Def.'s Facts, ¶ 78 ("ADMITTED as to what the hearsay and ex post opinion and declaration of Grizzle state; but this is irrelevant to how he treated women, at least five others who have been located. See, *Burlington Industries, Inc. v. Ellerth*, 542 U.S. 742 (1998)."). This denial – like many similar ones on Cardoso's response – is improper and ineffective.

and did not want to be deposed but that she was "okay" with Wahba. Dkt. 42-4, O'Daniels Dep., at 17:2-3. 18:25-19:3.

Angie Valdez, a former floating supervisor for Verizon who worked under Wahba. left Verizon because she disliked working with Wahba. Specifically, she thought he was "disrepectful," "rude," and disengaged. Dkt. 42-5, Valdez Dep., at 35:18, 36:25; *see also* 36:13-22) (when Valdez met Wahba, "he looked [her] up and down and turned around. Like, his hello was just, you know, saying hello because he had to say hello, not a sincere hello, you know, it's nice to meet you, you're going to be my floating supervisor"). Valdez stated that two other female Verizon employees (Shellie Luyando and Danielle Brown) also disliked Wahba. Valdez opined that these individuals had likely declined to come forward in this case because they still worked for Verizon and feared retaliation.

Carol Boudreau worked as a sales representative at the Crystal Lake store in 2012. At this time, she and Cardoso were the only female employees at that location. Boudreau provided a declaration in which she stated that she "sensed a feeling of gender discrimination against [Cardoso] by [Wahba]." Dkt. 42, Ex. 6, at ¶ 3. Boudreau felt that Wahba treated Cardoso "with disdain" but was pleasant to male employees. *Id*. at ¶ 3 ("It was quite obvious what he was doing, as we [Boudreau and Cardoso] would look at each other.").

During her deposition, Cardoso acknowledged that male managers in Wahba's district, including "Jerry from Belvidere," felt that Wahba did not support them. Dkt. 34-1, Cardoso Dep., at 62:4-15. According to Nunez, Cardoso is the only female Verizon employee who came to her with a complaint about how Wahba treated women.

## II. LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. LEGAL STANDARD FOR THE DIRECT METHOD OF PROOF

Cardoso states that she wishes to proceed using the direct method of proof for her claims of gender discrimination and retaliation. With respect to her gender discrimination claim, under the direct method of proof, Cardoso must "show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-939 (7th Cir. 2003). With respect to her retaliation claim, under the direct method of proof, Cardoso must submit evidence from which a jury could reasonably conclude that: "(1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) there was a causal connection between the two." *See Malin v. Hospira, Inc.*, 762 F.3d 552, 558-59 (7th Cir. 2014). Here, it is undisputed that the termination of Cardoso's employment is a material adverse action and that Cardoso's complaint to Nunez about Wahba's alleged gender bias is protected activity.

The parties dispute whether Cardoso's complaints to management about Heath's tardiness is protected activity and Verizon's motivation in firing Cardoso.

"Despite the name of the direct method of proof," a plaintiff may rely on both direct and circumstantial evidence to support a claim under the direct method of proof. *Id*. at 559. Cardoso relies on circumstantial evidence or, as the Seventh Circuit has put it, a convincing mosaic of facts supporting an inference that she was the victim of discrimination. *See Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 699 (7th Cir. 2014) ("We have used the metaphor of a 'convincing mosaic of circumstantial evidence,' evincing the image of a mosaic whose individual tiles add up to a complete picture, but that is just one means of conceptualizing the requirement that the circumstantial evidence must be sufficient to support the necessary inference."). "A convincing mosaic must include evidence from which an inference of retaliatory intent could be drawn." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643-44 (7th Cir. 2013).

This evidence can "include: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id*. at 644-45. Because the concept of a "convincing mosaic" is a "rhetorical tool[]," these elements are "not exclusive, nor are they a set of prongs of a circumstantial evidence 'test.'" *Id*. at 644. Instead, the "ultimate question" is whether, when drawing all reasonable inferences in the plaintiff's favor, a reasonable jury could find it is "more

likely than not that the plaintiff was subjected to the adverse employment action because of [her] protected ... activity." *Id.*

<strong>IV.  ANALYSIS</strong>

Cardoso contends that she was the victim of gender discrimination and retaliation.[14] Specifically, she argues that (1) Wahba discriminated against women and (2) her employment was terminated because she reported Heath, her male supervisor, for tardiness and complained about Wahba's bias against women to Nunez.

**A.  Gender Discrimination**

Cardoso asserts that Heath and Wahba were involved in the decision to terminate her employment.  Alternatively, she argues that the decision-makers were acting as the "cat's paw" for Heath and Wahba.  She also argues that she must have been the victim of gender discrimination because Verizon decided to fire her but gave Paredero – who is male – a final written warning.

**1.  Heath and Wahba**

In the section of her brief captioned "[s]uspicious timing and ambiguous statements and behaviors," Cardoso lists the following alleged circumstantial evidence supporting her claim of gender discrimination:

---

[14]  In her response to Verizon's motion for summary judgment, Cardoso clarifies that despite her use of the phrase "hostile work environment" in her filings, she does not wish to pursue a hostile work environment claim.  Dkt. 41, Pl.'s Resp., at 1, 7.  Thus, the court will not consider this issue.

- Heath and Wahba "insidiously manipulated Nunez" to fire Cardoso because Cardoso twice reported Heath for tardiness in 2011 and 2012.[15]

- Wahba was suspiciously attentive to Cardoso on July 6, 2012 (two days after the incident with Paredero and Cardoso). "Wahba was mysteriously and insidiously friendly to Cardoso; she knew something was awry. Wahba's behavior … wasn't sincere, it wasn't genuine …. Well obviously she (Núñez) spoke to him about his behavior, so he started to acknowledge me … He was acting different than he had normally acted."

- Heath's use of the word "horseplay" to describe the July 4, 2012 incident "is a pretext for discrimination and payback for Cardoso's having reported him twice for his chronic tardiness."

- Cardoso's complaint to Nunez about Wahba gave Wahba a motive to join Heath in wanting to "rid themselves of Cardoso."

- "Wahba stated he knew nothing about the complaint; but there is an inference that he knew of the complaint from the grapevine (Heath and Núñez) which is sufficient to defeat summary judgment . . . . Surely, he knew what was going on, and ineluctably had some input in the decision to fire Cardoso with his discriminatory motive for reporting him for gender bias."

Dkt. 41, Pl.'s Resp., at 10-11.

### a. Heath

To establish liability under Title VII, Cardoso must prove that she engaged in protected activity. *See Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). Activity that is not related to a plaintiff's membership in a protected class is not, itself, protected. *See Hutt v. AbbVie Products LLC*, 757 F.3d 687, 693 (7th Cir. 2014). To the extent that Heath was aware that Cardoso had reported him for tardiness, Cardoso's complaints about his tardiness are not protected conduct because they do not relate to her gender. *See id.*

---

[15]  This portion of Cardoso's brief states that she reported Heath and Wahba for tardiness. The cited supporting paragraph of Cardoso's declaration does not correspond to this assertion but other assertions in the declaration make it clear that Cardoso reported Heath twice, once to District Manager Hansen and once to Wahba.

Cardoso acknowledges this, but nevertheless argues that her complaints about Heath became actionable after she complained to Nunez about Wahba's gender bias because Heath "had reason to know" about Cardoso's complaint about Wahba. Dkt. 41, Pl.'s Resp., at 11. Cardoso appears to be contending, without citation to any supporting evidence, that Heath somehow knew she had complained to Nunez about Wahba and that this caused Heath to harbor gender-based animus against her due to Heath's desire to support Wahba and his anger about being reported as tardy. This theory is completely speculative.

In any event, with respect to Heath and Wahba's alleged involvement in the decision to terminate Cardoso, there is no concrete evidence connecting Heath to the decision to terminate Cardoso's employment. Heath, Wahba, Nunez, Ritchie, and Trozell all definitively stated that Heath was not involved in the decision to terminate Cardoso's employment. Cardoso's contention that Heath used the word "horseplay" to describe the July 4, 2012 incident as "a pretext for discrimination and payback for Cardoso's having reported him twice for his chronic tardiness" is simply not enough to support an inference that Heath was involved in the decision to terminate Cardoso's employment and sought to have her fired based on gender discrimination.

### b. Wahba

Cardoso stresses that Wahba filled out a portion of the MSOF at Nunez's request and based on information Nunez provided. According to Cardoso, this means he necessarily was involved in the decision to terminate her employment. The record shows, however, that a manager had to prepare the fact section of an MSOF. Nunez asked Wahba to fill out a portion of the form after she and Dennison decided to recommend termination. While Wahba filled in basic information on the MSOF, he did not fill out the section of the form regarding discipline.

Heath, Wahba, Nunez, Ritchie, and Trozell all unequivocally asserted that Wahba was not involved in the decision to terminate Cardoso's employment.

In response, Cardoso contends that Wahba "must have known" about her complaint about him. She concludes that he, therefore, must have been involved in the decision to terminate her employment. In support, she characterizes Wahba's behavior after the July 4th incident as "suspiciously attentive," "insidiously friendly" and insincere. She also argues that Heath or Nunez must have told Wahba about her complaint to Nunez because of "the grapevine" so Wahba "must have provided input" when Verizon was deciding whether to terminate her employment.

These theories are all based on Cardoso's personal hunch that Wahba knew about her complaint and was involved in the decision to terminate her employment. As the Seventh Circuit has noted, "if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (internal quotations omitted) (concluding that plaintiff's subjective impression about the meaning of a supervisor's comment did not create a genuine factual dispute); *see also Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008) (plaintiff's "belief that her conduct . . . did not warrant a ten-day suspension" was insufficient to withstand summary judgment); *Nieman v. Grange Mut. Ins. Co.*, No. 11-3404, 2013 WL 1332198, at *16 (C.D. Ill. Apr. 2, 2013) (plaintiff's "speculative inferences and unsupported theories" based on his belief that an employer decided that he was unqualified for a job after it discovered he had engaged in prior protected activity was insufficient to survive summary judgment).

Cardoso disagrees, contending that the Seventh Circuit has recognized that an office "grapevine" can be enough to show that an employer was aware of protected conduct. In support, she directs the court's attention to *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938 (7th Cir. 1999). In that case, the plaintiff alleged that she was terminated after making a complaint about elder abuse in a nursing home. The workforce at the nursing home were all aware that the plaintiff had a close relationship with the alleged victim and just before making her complaint, the plaintiff asked a co-worker for the abuse hotline telephone number. *Id*. at 941. While the ultimate decision maker did not know about her complaint, others who recommended termination did, and were also aware of the plaintiff's relationship with the alleged victim. Based on these facts, the Seventh Circuit concluded that "[i]n the small universe of employees at [the nursing home], it is reasonable to infer that a grapevine exists. These circumstances are enough to create a triable issue of fact" as to whether the ultimate decision maker terminated the plaintiff based on her complaint. *Id*.

Cardoso reads *Scott* too broadly. It simply does not stand for the proposition that a "grapevine" exists in all workplaces and that this purported "grapevine" creates an issue of fact as to whether information known by subordinate employees can be imputed to the ultimate decision maker and whether that decision maker acted on the "grapevine" information. The "grapevine" in *Scott* existed because the fact that the plaintiff engaged in protected activity was common knowledge so it was reasonable to infer that the individuals who decided to terminate the plaintiff knew about this activity. The so-called "grapevine" at Verizon that links Wahba to the decision to terminate Cardoso's employment, however, is based on Cardoso's conjecture that contrary to Nunez's explicit testimony that she did *not* tell Wahba about Cardoso's complaint,

Wahba nevertheless somehow heard about the complaint due to unspecified office gossip and based on that information participated in the process that culminated in her termination.

This chain of reasoning is too speculative to support an inference that Wahba knew about Cardoso's complaint of discrimination, let alone that he was involved in the decision to terminate her employment.  *See Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) ("The plaintiffs must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have") (emphasis in original); *see also Salas v. Wisconsin Dept. of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007) (the plaintiff's assertion that an email about his protected activity was being sent around the office "like a 'Breaking News Story'" was not enough to support an inference that the decision makers knew about the plaintiff's activity before they recommended his termination).

Similarly, to the extent that Cardoso is implying that Wahba knew about Cardoso's discrimination complaint because Nunez told Wahba about it, Nunez denied that she did so. With respect to the decision about her termination, Heath, Wahba, Nunez, Ritchie, and Troxell all denied that Wahba had any involvement.  Any claim that this testimony is untruthful and must be evaluated by a jury based solely on Cardoso's personal belief that these witnesses lied is insufficient to withstand summary judgment.  *See Nieman*, 2013 WL 1332198, at *16 (stating that "the Plaintiff's consistent and conclusory assertion that [the decision maker] or others have lied throughout these proceedings is not enough to create a factual dispute regarding whether there was a causal connection between his prior protected activity and the decision to disqualify him").

### c. Cat's Paw

Cardoso also invokes the so-called "cat's paw" theory to support her claim that the decision to terminate her employment was infected by Wahba's knowledge of her complaint of gender discrimination. "[T]he 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (citing *Staub v. Proctor Hosp.*, — U.S. —, 131 S.Ct. 1186, 1192-94 (2011)).

Cardoso's reliance on the "cat's paw" theory fails for two reasons. First, she has not established that Wahba knew about her complaint of gender discrimination. He cannot have used information he did not know to influence the decision makers. Second, Verizon correctly notes that the Seventh Circuit has held that to create a question of fact under the cat's paw theory of liability, a plaintiff must point to "affirmative evidence that [somebody] improperly influenced the decision-makers." *Brown*, 700 F.3d at 1108. Speculation that improper influence may have existed is insufficient to carry that burden. *Id.*; *see also Hruska v. Forest Preserve Dist. of Cook Cnty., Ill.*, No. 10 C 7433, 2013 WL 1195699 (N.D. Ill. Mar. 21, 2013) (same). Thus, Cardoso's arguments about the "cat's paw" theory are unavailing.

Based on the court's rulings about Wahba's lack of knowledge of Cardoso's complaint of gender discrimination and his lack of involvement in the decision to terminate her employment, the court will not address the parties' arguments about Cardoso's belief that Wahba was biased against women due to his cultural background. Similarly, it will not address the parties'

arguments that other current or former female Verizon employees believed that Wahba was biased against women.

### 3. Similarly Situated – Paredero

 "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination . . . . The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Board of Educ. of City of Chic.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (internal citation omitted). Two individuals are similarly situated if they are "directly comparable . . . in all material respects." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). The "similarly situated" inquiry is meant to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decisionmaking personnel, which helps isolate the critical independent variable – discriminatory animus." *Id.* (internal quotations omitted). An allegedly comparable employee does not have to be identically situated to the plaintiff. *Id.* Instead, the court " must conduct a common-sense examination" to determine if an employee is comparable. *Id.*

Cardoso asserts that the fact that Paredero received a written warning while she was fired creates a trial question regarding the true reason for her termination. According to Cardoso, she worked as an Assistant Manager only when Heath was out of the store and otherwise, was Retail Sales Representative just like Paredero. This contention is flatly contradicted by the record.

Cardoso's job title was Assistant Manager. She was responsible for, among other things, leading the team, assessing and managing the performance of subordinate employees, implementing merchandising plans, preparing financial and sales reports, and resolving escalated customer complaints. Moreover, because she was an Assistant Manager, Cardoso's

commissions were based upon the overall performance of the Crystal Lake store. On the other hand, because Paredero was a Retail Sales Representative, his commission was based on his individual performance. Cardoso also received management-specific training that was not given to Retail Sales Representatives. In short, Cardoso was not a Retail Sales Representative like Paredero. Because she was an Assistant Manager and supervised Paredero, she is not similarly situated to Paredero. *See*, *e.g.*, *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009).

On a related note, Cardoso's submissions repeatedly criticize Verizon for firing her without viewing the entire security tape. This does not create an inference of discrimination. Nunez watched selected portions of the security tapes based on her interviews with witnesses, and during Cardoso's conversation with Nunez on August 14, 2012, before Nunez decided what portions of the tapes to view, Cardoso did not tell Nunez that:

– She felt intimidated or threatened by Paredero, either on July 4, 2012, or at any other time during her employment with Verizon. (Cardoso concedes that she did not complain about Paredero but states that she did not complain because she felt that neither Heath nor Wahba would take any corrective action).

– She believed she had been harassed based upon her gender.

– She believed she was being terminated in retaliation for complaining about Wahba or because of her sex.

– She had acted in self-defense on July 4, 2012 when she hit, kicked, and threw various objects at Paredero.

Cardoso does not point to any authority indicating that based on the information elicited in Nunez's interviews with Cardoso, St. Marie, and Paredero, Nunez was required to watch more than the portions of the videotapes that were the subject of the interviews. The court also notes that Cardoso gave the court a disk containing the entire day's worth of videotapes. The court

-35-

notes that this is a substantial amount of video since the disk contains twenty-eight clips consisting of footage from sixteen different cameras, many of which show interior views.

In any event, the fate of Verizon's summary judgment motion on Cardoso's gender discrimination claim does not turn on who was the aggressor, or who was most blameworthy. It turns on whether Cardoso has pointed to evidence showing that gender discrimination played a role in her termination. She has failed to do so. In contrast, Verizon correctly notes that the videotapes show Cardoso – who was in charge of the Crystal Lake store on July 4, 2012 – hitting Pardero, throwing objects at him, and kicking him while he is lying on the floor (among other things) in violation of Verizon's policies. Verizon's motion for summary judgment as to Cardoso's claim of gender discrimination is granted.

## B.    Retaliation

The parties agree that to establish retaliation using the direct method of proof, Cardoso must show that (1) she engaged in activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between her protected activity and the adverse employment action. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). The parties dispute causation.

Cardoso argues that her retaliation claim survives summary judgment based on the same purportedly protected activity underlying her gender discrimination claim – her complaints about Wahba's alleged bias against women (protected activity) and Heath's tardiness (unprotected activity). *See* Dkt. 41, Pl.'s Resp., at 1 ("Plaintiff believes that her protected activity, in combination with her complaints about Heath's tardiness issue motivated them (Heath and Wahba) to have Núñez discharge her for the pretextual reason that she engaged in 'horseplay'

with a co-worker (Marcos Paredero) on July 4, 2012."); *id*. at 10 (Cardoso's "theory of liability is that both Heath and Wahba wanted to fire her and that, contrary to Verizon's contentions, they are not telling the truth about (1) their participation in the decision[,] (2) Wahba's knowledge of Cardoso's protected activity on July 25, 2012[,] and (3) the real reasons for the discharge."). She also contends that she was fired solely because Wahba wanted to retaliate against her. These arguments are inconsistent: either Cardoso believes that the decision to terminate her employment was based, in part, on Heath or not.

Verizon asserts that because Cardoso blames her termination on both retaliation by Wahba due to gender-based animus *and* retaliation by Heath due to her reports of his tardiness, Cardoso's protected activity (her complaints to Nunez about Wahba) was merely a "motivating factor" for her termination, as opposed to the "but for" cause. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S.Ct. 2517, 2534 (2013). Cardoso concedes that to prevail on her retaliation claim, she must establish that "her discharge was caused by the protected activity, and [that protected activity is] not merely one of the factors." Dkt. 41, Pl.'s Resp., at 15. She then focuses on her complaint about Wahba's alleged gender bias and does not address her prior contention that her complaints about Heath also played a role in her termination.

Even if Cardoso could establish that her complaint about Wahba's gender bias was the "but for" cause of her termination, her retaliation claim would fail for the same reasons that her discrimination claim foundered. Specifically, Cardoso's gender discrimination claim and her claim of gender-based retaliation are both rooted in Wahba's alleged discrimination against Cardoso based on her gender and Cardoso's complaints to Nunez about Wahba during Nunez's investigation of the stapler-throwing incident. As discussed above, both claims turn on Wahba

and his alleged input into, or influence on, the decision-making process that led to the termination of Cardoso's employment.

Cardoso has not pointed to anything other than speculation to support her theory that Wahba knew she had accused him of gender discrimination prior to her termination or that Wahba was substantively involved in the decision to terminate her employment or influenced this decision. Cardoso claims that "there is an inference that he likely knew, could have known, or should have known that Cardoso had reported him." *Id.* She also asserts that with respect to Wahba's purported participation in the decision to terminate her employment, a jury must decide "[w]hether Verizon is lying about what happened" and "which party top [sic] believe." *Id.* at 16. As with her gender discrimination claim, however, this sort of conjecture is not enough to survive Verizon's motion for summary judgment. Because Cardoso has failed to establish a triable question of fact regarding Verizon's motivation in firing Cardoso, Verizon's motion for summary judgment as to Cardoso's claim of retaliation is granted.

## V.  CONCLUSION

For the above reasons, Verizon's motion for summary judgment [31] is granted. The clerk is directed to enter final judgment accordingly and to terminate this case.

Date:   November 26, 2014                     _____/s/_____
                                              Joan B. Gottschall
                                              United States District Judge